May it please the court, my name is Eitan Kasteljanic, I'm representing Joshua Rogal in this appeal. In June 2002, Rogal was driving a car when he was hit by a drunk driver. He suffered multiple serious injuries including a traumatic brain injury. He was treated in the hospital more than 50 times since his accident. Despite this, Rogal returned to work and he continued working until May 2008. He did not put in any disability claim for the period prior to 2008. I'd like to now focus on ALJ's main errors that require reversal here. As part of his application for disability benefits in 2008, Social Security had Rogal evaluated by a psychologist, Dr. Dixon. Dr. Dixon did diagnostic testing and through the testing determined that Rogal's visual displayed memory was in the 0.1 percentile. That's a very low result. General memory was in the 0.3 percentile. Now the ALJ mentioned this evidence in her decision. However, the ALJ never articulated what weight she was according to this evidence and she failed to incorporate into her decision Dr. Dixon's findings and opinion. Now the specific findings and parts of his opinion, Dr. Dixon didn't make a real clear opinion about what kind of work Mr. Rogal could do or exactly. It wasn't that clear what he said. I'd like to ask you to forgive me for interrupting, but if you could go one step backwards. I read Dr. Dixon's report to be really inconsistent, so maybe you could help me. I think it said he displayed good functional social skills, expresses himself well, but his predominant mood was depression, sadness, and frustration. His judgment was fair. His memory testing was extremely low to low average. But he also said his ability to reason and understand was good and he would adapt further well to new environmental conditions. What do I make of that? Well, the complication here is we're dealing with a head injury. And there's been no, the file doesn't contain neuropsychological testing for a simple reason that Social Security does not generally ever pay for that because it's expensive. It's not, to my knowledge, and I did not represent Rogal at his hearing, but I, looking at the record here, which has lots and lots of medical records from the earlier time period when I believe his medical treatment was being covered by California Victims' Compensation. But during, from the current period, it's not my understanding that he actually has medical insurance. And that would explain, I think, why there isn't a whole lot of current treatment. There is not a current. But I have this. We have Dr. Dixon's report, and your claim of error is that we don't know what weight was given to it. The, what we don't have here is a neuropsychologist who could tease out the executive functioning from the memory functioning and all the details. But you're right. We have to go with what we have. What we do have here is un, it's phenomenally low test results of some memory testing. 0.1 percentile is, you just don't see that. That is a very low test result. Now, to say that a person whose test, whose memory is testing at the 0.1 to 0.3 percentile in certain tests, that doesn't show up in the ALJ's residual functional capacity assessment. What's the date of this report, please? Oh, Dr. Dixon's report? I believe it was in 2008. I don't have that right here. He applied for benefits in 2008. It was done fairly soon after that. November 3rd, 2008. Because, of course, the opposing counsel is going to talk about the fact that this individual had, I think it will be conceded very serious injuries, and then he went to work for several years. Well, yes, they do point that out in their brief. Now, what's interesting about that is the work that he had done, he continued to work sporadically, actually, between 2002 and 2008. If you look at his earnings record in the record, his earnings were never all that large because he was mostly working part-time because that's all he could handle. And much of the work he did was working, it seems like it was working with people with some sort of disabilities. Certainly his last two years of work was as a caregiver for his foster brother who had Down syndrome. That job required no lifting, and it was essentially a family member. So his ability to do that work doesn't really speak to how would his memory impairment affect his ability to do competitive work. So, counsel, I have a question about his onset date of May 15, 08. What does the record say? What was the precipitating event that he worked up to that period of time, and then on May 15, 08, he was no longer able to work? The two precipitating events then were that he was no longer, he was missing work even in taking care of his foster brother because he was having to go to the emergency room, he was having health problems, and he was missing work. The other precipitating event was he could no longer handle even the stress of, I think at that time he was living in the Los Angeles area, and he couldn't handle it. And so he got out of there and moved to Washington State. So those were the two. Why did he stop working? Because he was missing work. He couldn't even handle working for his foster brother. So government argues that it's harmless error for the ALJ to fail to discuss Dr. Dixon's findings and opinion and to fail to explain what weight she was according to it. I don't think that's harmless because if the ALJ had incorporated limitations in her residual functional capacity assessment that took into, fully took into account Dr. Dixon's opinion, then it arguably could be harmless. But she did not. Her residual functional capacity assessment, the only thing that comes close is that she limited Ruggall to simple and some complex work. Well, the complex work part just doesn't make any sense with that level of memory impairment. And once again, even simple work, if you can't, I don't know, there's no neuropsychological evaluation, but even for simple work, it seems that having that severely impaired memory could affect your ability to perform that. Now the other thing that's wrong, I'm going to jump to the residual functional capacity assessment. The other thing that's wrong with that is Ruggall testified about his limitations on standing and walking and his need to change positions, his need to lie down, and the fatigue that he experiences. And the ALJ actually has a contradictory statement in her decision where she said, yeah, okay, he's got, I agree, he has severe back pain and he has fatigue, et cetera. But then none of these, although she said he had these things, the limitations that are associated with these impairments, with these symptoms he was experiencing that she agreed he was experiencing, there's no limitations in the residual functional capacity assessment. Ruggall testified about using a cane, been using one for several years, and that doesn't show up anywhere. A person using a cane isn't going to be able to do light work, which is what the ALJ said he could do. She said he could do full-time light work. She also didn't have any, including the residual functional capacity, his need to change positions and his need to lie down and the effects of his fatigue. Now, it's unclear if the fatigue, there's diagnoses in the record of chronic fatigue syndrome, there's diagnoses of Addison's disease, which is somewhat in dispute, but his treating physician from Los Angeles, Dr. Phillips, opined that he had, more likely than not, he had Addison's disease, and the basis for the diagnosis was he treated it the way you would treat Addison's disease, and the treatment helped. But part of that disease involved when he would have, feel an attack coming on, he had to take medication and he had to get in bed. So the ALJ rejected Dr. Phillips' opinion that Ruggall couldn't work. The ALJ rejected the opinion of his new physician, Dr. Mintir, that Ruggall could not work. Now, Dr. Mintir only, in this record, only saw Ruggall, I believe, three times, but as part, when he first saw him, Ruggall brought him his medical file. Dr. Mintir described it as being 10 inches thick. Dr. Mintir said, after reviewing this extensive medical record, I don't think he can work. The ALJ rejected Dr. Mintir's opinion, called into question his independence, or even asked if he was just, accused him of just relying, stated he was just relying on the subjective complaints of Ruggall, rather than his extensive review of a 10-inch thick medical file. In fairness, opposing counsel is going to respond, as he did in the brief, so I want a chance for you to respond, that the bulk of that 10-inch medical record really pertained to the initial very serious accident, and that he worked for several years after that. So what is your response to that? The physician's report didn't seem to acknowledge that. Okay. Well, the medical record doesn't just pertain to the serious accident, because it continued straight on through 2008 when he moved to Washington State. So it wasn't just that it was the early time period. I appreciate that. There was ongoing treatment throughout the time he was working, which explains why his work never amounted. In fact, technically his work was not even past relevant work throughout that time period, because it never reached substantial gainful activity levels. But isn't the point that that's the difficulty the ALJ had with those opinions, and certainly with Dr. Phillips' opinion that said, I think he said it couldn't work at all. Okay. I'm not asking the ALJ, and I'm not saying the ALJ had to accept his opinion that Ruggall cannot work at all. What I'm saying is that Dr. Phillips listed the other problems he was having, including problems using his left hand, problems with the sitting and the standing, the fatigue, the need to lie down, and these were problems that he'd had the entire time Dr. Phillips was treating him. And Ruggall's testimony was consistent with that. It's those limitations that I think the ALJ erred in rejecting. And once again, the decision on whether or not a person is disabled is up to the judge. It's not up to a doctor. So there's a Well, the question is whether she's got support for the ALJ's decision. That's what we're looking at. Right. The ALJ, there's support for her not fully accepting a blanket opinion. He's disabled when Dr. Phillips wasn't even seeing him anymore. That makes sense. But there is not support, and the ALJ didn't even explain why she was rejecting his opinion about limitations on sitting, standing, the need to lie down, and the fatigue. It's those particular parts of Dr. Phillips' opinion that are not that the ALJ did not state that she was explaining or explain why she was rejecting those parts of his opinion. And would, I mean, would it be definite that the limits that Dr. Phillips saw would continue to apply in the period after the onset of disability? Not necessarily. The way you figure that out is by looking at Rogal's testimony, and that dovetails into are any of the ALJ's reasons for rejecting Rogal's testimony credible? And none of them are. I run through every single one of them. None of her reasons for rejecting his credibility are convincing. And so you really, you can't look just at Dr. Phillips' opinion alone. Look at how Rogal was actually doing during that time period. If you don't have any more questions for me, I would like to reserve a little bit of time. Thank you. Okay, Mr. Goddard. May it please the Court, Jordan Goddard appearing for the Commissioner of Social Security. Good morning. Mr. Rogal certainly had serious medical problems after his accident in 2002. However, the record shows that he recovered sufficiently in order to return to work. The strongest piece of evidence that I have yet to hear a real refutation of is the fact that he did go back to work after his accident in 2002. Opposing counsel says he was never able to really return to work full time. What is your response to that? Well, first of all, I have to point out that I haven't actually briefed that because that argument has never been made before now that I'm aware of. Second of all, about not returning to work full time, that is completely erroneous. I don't know where he's, on what basis he's making that claim. He alleged, Mr. Rogal alleged that in, through 2008, he was working for the State of California as the official caretaker of his brother. He described that work as 24-7 work. He definitely described it as full time work. He was, even if it wasn't full time work, he was well, he earned actually more than twice the minimum amount for that year that we consider to be substantial work. So he was working full time at that job and being paid $24,000 a year, which is well over the presumptive amount for significant work activity. There is no indication that his work activity was not full time. He may be referring to a job coach job that Mr. Rogal worked. I believe he left that in 2005. In that job, he also worked with autistic people. He has a long history of working with people with special needs. At that job, he worked 30 hours a week, and he was also at that time still working part time as his brother's caretaker and being paid by the State of California. He doesn't tell us how many hours a week he was working as his brother's part time caretaker, but we know he reported he was working 30 hours a week as a job coach for a non-profit organization that worked with autistic individuals. And on top of it, he was working part time taking care of his brother. So I don't know where this claim that he was only working part time even originates from. I've seen no evidence in the record to support that. He also implies that the work may not have been competitive work, that he was just working for his brother. First of all, I'd like to point out that he was working for the State of California. Actually, he's being paid by the State of California, and if he's now alleging in his reply brief that he was effectively defrauding the State of California and not doing the work that he was claiming that he was doing, I find that interesting. Additionally, when Mr. Rogal, and I apologize again for not briefing this, this wasn't briefed by counsel, so I didn't have an opportunity to. But there is a form that we have claimants fill out, and you'll find that at ER 149, where he talks, where Mr. Rogal actually describes this job, working for the State of California as his brother's caretaker. And one of the questions we ask is, was this work performed under special conditions? Please check any of these boxes that might apply, so that we can evaluate whether this wasn't real work. And it's got things like, I got help from others doing my job. I was only working for a relative or a friend, and therefore under lower standards. There's a whole list, and it goes on to page 150, of different conditions that could qualify as special work conditions that would indicate that this is not sort of real work. And Mr. Rogal checked no. He said he made the claim to Social Security when he filed his application that this was a real full-time job, and he had expectations that he was held to, and that he apparently met those expectations for years. So the claim that this wasn't a real job, or that he was working part-time, is simply not supported by his own claims to the Social Security Administration. Can I shift gears and ask you to address the failure to assess any weight to Dr. Dixon's report? Well, yes, Your Honor. I disagree that there was no weight given. There's actually an extensive discussion of Dr. Dixon's report. And I think you made a good point earlier in pointing out that it can be interpreted in more than one way. So on your first point, I read the ALJ's opinion as making a series of observations. I'm sorry, summarizing. A series of observations about what Dr. Dixon did or didn't find. Then where's the conclusion or explanation of what the ALJ did with that? You know, the ALJ doesn't give us an explanation other than to lay out the medical source statement at the end. I think that's opposing counsel's point. So given that, I think there is one very low score there. What do we do with that? Well, I think to the degree that it is error, it's going to be harmless error. And that's because of the report of Dr. Vincent Gologly, which you'll find on ER 492. Dr. Gologly specifically evaluates the test scores and Dr. Dixon's report. And he says, and I quote Dr. Gologly, after evaluating all of these memory scores, he says his scores were sufficient that he should be able to hold down a job. So when we're evaluating under the substantial evidence standard, whether the ALJ was reasonable in her treatment of this opinion, by relying on Dr. Gologly, who specifically evaluated these scores and has expertise in this area, who said, bottom line is, these do not prevent employment. And then when you throw in the fact that the memory problems presumably originate with the 2002 accident. Mr. Rogel is a young man, he's in his 20s, so he's not to the point where we expect to see sort of memory deterioration with age. The only real explanation of where these memory problems come from is from this accident. However, he worked, and in fact, his neurologist at the time, 2007, Dr. Postigo, noted specifically that he was working at the time, that he complained of memory problems, but his memory was sufficiently functional to hold down a job. And that is at ER 606, shortly before the alleged onset date. And there is no precipitating event that I've been able to find in the record, other than some reference to him wanting to get out of Southern California, where his friends and family were. And then, frankly, difficulty finding work in 2008 doesn't surprise me, as someone who remembers the economy at that time, and was in fact looking for work. So I think there's more than one possible explanation for why he suddenly stopped working. And the ALJ... So could you address the exclusion of the lay witness testimony? We had the same issue in the last case. It just strikes me as odd that the Social Security Administration has these lay witnesses' forms, and they fill them out, and they submit them, and then they're given. In this case, last case, they were excluded. In this case, the ALJ gives them very little weight. But they do have additional evidence, other than his own subjective comments. Your Honor, could you maybe point me towards something that, if there's anything specific? Yeah, well, okay. There's a lot of stuff, but let's see. Was it his mother or friend who talked about his need to have access to the restroom at a moment's notice? I believe that was his mother who said that. Was that his mother? Yes. The ALJ pointed out his mother, who lives in Southern California and had a lot of contact with him shortly after the accident, seemed to be describing his condition after the accident. And it correlates with his medical records at the time. But if we look at the medical records from the period where he's alleging disability, he doesn't have those urological issues. She's talking about this in the present tense. She filled it out. We have a date for this. June 2010. Yes, Your Honor. And that's exactly why the ALJ provided a germane reason, supported by substantial evidence for finding this statement to not be persuasive, because she's describing these severe urological issues. But if you look at the records of his urologist at the time, he wasn't having those issues at the time. And so the ALJ cited the inconsistency between the current medical records and the fact that what she was describing seemed to correlate with the medical records earlier in time, before he's alleging disability. He definitely had urological issues after the accident. He had multiple reconstructive surgeries. But his doctor at the time that he's alleging disability says he's doing well there. It's not a problem. And the case law is clear that when a lay witness gives testimony that simply contradicts what the treating physician is saying, that is more than a germane reason for rejecting that testimony. If we want to turn to the other lay witness statement, I believe his name is Mr. Brown. He's known since the last two years, which means he's observed him in Washington, in Washington State. Yes. And the ALJ, Mr. Brown tells a very interesting story, and it's kind of hard to reconcile the story he tells with sort of any medical records, any possible medical problems. He talks about Mr. Rogel texting him one day and saying that he's going into Addison's crisis. Well, first of all, if you're going into Addison's crisis, you need immediate medical attention or you will die. It is not a minor matter. And the record does not indicate that Mr. Rogel has ever had an Addison's crisis, ever. But he sends a text message to his friend and says, I am having an Addison's crisis. Please come over. A few hours later, the friend comes over, and he can't rouse Mr. Rogel. Mr. Rogel, for an hour, seems to be unconscious. And then when he tries to pick Mr. Rogel up and take him into his bedroom and lay him down, Mr. Rogel suddenly pops awake and says, I've been fully conscious for the last hour now, and I've heard everything you've said, but I've been unable to respond. And Mr. Brown says, oh, my gosh, I'll take you to the emergency room if you want. And Mr. Rogel says, no, I'm okay. And that's the end of the incident. And so, again, we have inconsistency with the medical record. There's no medical explanation for this. I think Mr. Rogel has speculated at some point he may have had a stroke or something. But there's simply no medical documentation. But he also says he took him to the ER two times, and he was diagnosed with adrenal deficiency. I don't know if that's related to Addison's or not. Yes, that is what Addison's is, an adrenal deficiency. The problem, though, with that statement is we have a couple of emergency room visits from that time that seem to correlate with what Mr. Brown describes. They don't mention adrenal deficiency on the blood screen. Really, if you look through the medical record, Mr. Rogel claims a lot of things that are definitively disproven objectively by the medical record. He tells all of his doctors he has peripheral neuropathy, for example. Dr. Postigo, the neurologist, does extensive testing, electro-diagnostic testing, MRIs, MRIs, CAT scans, everything. And the ALJ doesn't mention Dr. Postigo's report, right? He does, yes. It's not a very lengthy discussion, but he does mention it.  Where? Because we didn't see that. Sorry. On ER 20, third paragraph, in February 2007, the claimant underwent a comprehensive workup at Mission Hospital. He does not identify Dr. Postigo by name. He refers to the records, though. 23. And if I could, I don't want to interrupt you while you're reading, but there are a number of things. I was just looking for where you're citing. Sorry. ER 23. ER 20. I'm sorry, ER 20. Don't worry about your time. We'll give you a little more if you need it. Thank you. Yes, ER 20, beginning, third paragraph, in February 2007. Okay. Mission Hospital, that was Dr. Postigo? Yes. And the most important thing is the conclusion. There's no etiology for these complaints, or no etiology for these complaints was established, etiology being kind of a fancy medical term for basis. All right, go on. Just some things that Mr. Rogel's attorney brought up, the need for a cane. I find it interesting that he actually brought that up in oral argument, because every medical professional has said that he doesn't need a cane and has actually questioned why he's even carrying a cane. He's got normal gait, normal station, full reflexes, full muscle strength, no abnormalities that would justify the use of a cane. So the fact that he's simply carrying a cane tells us, actually under some other case law, that that, if anything, detracts from his credibility. He's trying to present himself as disabled when all the medical professionals say, you don't need this. Also about the insurance, I did not brief it, and I don't have a cite to the record, because this was never briefed at any point, the claim that Mr. Rogel did not have insurance. However, I do recall testimony to the effect that his parents had, he was under his parents' insurance and they were paying all of his co-pays. So there was an indication. I do distinctly remember that he was insured through this period, and I'm not sure where Mr. Rogel's attorney gets the notion that he's not. Are there any further questions from the panel? I don't have any, Judge Wardlaw. I don't. Judge Christin. No, thank you. I think that means you've done your job. And under time, even. Thank you. Thank you. Now, Mr. Yanich, do you have some time reserved? Starting with the last comment, parents' insurance. Mr. Rogel, I'm not going to give you his exact age now, but I think he's old enough that he's probably not able to be covered on his parents' insurance anymore, so that might explain why his insurance was not covered. Is he 31 now? He's 31 now, right? You're getting it faster than I will. I'll agree with you. Okay. But, yes, I think that would explain that issue. With regard to Mr. Brown, Mr. Brown talked about the problems, you know, his observations that Rogel only used paper plates because of dropping things, his observation that he'd never seen him stay in one position for more than 30 minutes. This is at 226 and 227 in the record, Mr. Brown's lay statement. I want to start also, I need to correct myself about the work. His work was full-time. It was the kind of work that it was. From 2002 through 2004, it was not. So after his injury when he was- Not full-time or it was not? No, it was not full-time. His earnings were very low for those first two or three years. After that, that he went to work as a brother's care provider? It was after that. At first, he had about two years where he was working as an autistic, as a job coach for an autistic child of some sort or an autistic adult. I'm not sure of the details. That's at pages 182 and 183 in the record, his descriptions of those two jobs. The 182 is the description of the job coach job. The 183 is the description of the job taking care of his foster brother who had Down syndrome. Neither of those two jobs is the kind of job that would necessarily require or that would- the full level of functioning that you normally would expect somebody would need. His memory problems would not necessarily impact him from doing those two types of jobs. And fatigue, fatigue, fatigue. The fatigues in the record, the fatigues from Dr. Phillips, the fatigues in his description. I don't know. I wasn't at the hearing. I don't know if he was using the cane for fatigue or because he felt tired or for security. He was using it. And I think I've covered everything here. And the one last thing. There's a forum and he doesn't check the box, did you get special help on the job. He was taking care of his brother with Down syndrome. He just checked them out. I mean, he was there. He was the one doing it. Same thing with helping the autistic adult. He was doing the job. He was doing it to the best of his ability. I don't know if he knew how well he was doing it. I don't know those details. But there was no reason for him to endorse any special help because he wasn't getting special help. That still doesn't mean that he was able to do competitive, normal competitive work. And it certainly doesn't mean that he could do that since 2008, which is once again his alleged disability onset date. Thank you very much. I want to thank both counsel for their excellent arguments. Both Mr. Robel and the government should be glad they have excellent advocates here. If we need anything further, we'll send an order for supplement briefing. But otherwise, we'll just decide in due course. So the case of Robel v. Colvin shall be submitted.
judges: WARDLAW, GOULD, CHRISTEN